### HUNTINGTON'S DEVISEES v. TAYLOR et al.

(Circuit Court, S. D. West Virginia. November 9, 1907.)

1. ACTION—COURTS—JURISDICTION—PROCEEDINGS AFTER FINAL JUDGMENT.

Where an action in ejectment has been terminated by a verdict and judgment awarding a writ of possession, which has become final, the powers of the court therein are at an end, and it has no jurisdiction to thereafter adjudicate upon the independent rights of persons not parties simply at the instance of the marshal or other officer charged with the execution of the judgment seeking instructions from the court as to how

he shall perform his ministerial duties, even though such persons appear
and submit their contentions.

**2. EJECTMENT—EXECUTION OF JUDGMENT—DUTY OF OFFICER.**

The duty of a marshal or other officer in executing a writ of possession
issued on a judgment in ejectment is purely ministerial, to deliver posses-
sion of the land pointed out to him by the plaintiff, who takes posses-
sion of the same at his peril, and the officer has no right of appeal to the
court for instructions because of protests or notice served on him by per-
sons not parties to the action who claim independent rights in the land.

Action in Ejectment.   On motion to instruct the marshal as to ex-
ecution of writ of possession.

On August 28, 1794, William Morris, for Jacob Skiles, entered 40,000 acres
of land in Kanawha county, and on October 24, 1795, a survey thereof was
made and admitted to record in said county.   On January 19, 1795, John
Steele entered 60,000 acres, and on the 21st day of January, 1795, lifted or
withdrew 19,500 acres thereof and entered the same, and on March 17, 1795,
a survey thereof was made, and on November 11, 1796, a patent issued from the
commonwealth of Virginia to said John Steele for these 19,500 acres.   On July
11, 1798, a patent likewise issued to Jacob Skiles for the 40,000 acres.   These
two tracts of land adjoined each other and were situate on Cambell's, Blue,
Bell, and Kelley's creeks in said county.   C. P. Huntington, by purchase from
some of the Steele heirs, became the owner of 7,697 acres of this 19,500-acre
Steele tract, which had been partitioned in a chancery suit of Taliafero et al.
v. Patrick et al. by the circuit court of Kanawha county.   This 7,697 acres,
known as "lot C," in partition suit, adjoins the Skiles 40,000-acre tract.   This
Skiles tract became forfeited for nonpayment of taxes, and one J. D. Lewis at
a tax sale on February 3, 1841, became the purchaser and owner thereof.
Some time prior to February 2, 1874, Lewis had placed one John Lewis Taylor
upon this Skiles tract as his tenant.   At July rules, 1875, Huntington filed in
the District Court of the United States for this district, then having juris-
diction, his declaration in ejectment against Mecca C. Trimble, Aaron S. Trim-
ble, Isaac White, Andrew White, and said John Lewis Taylor, alleging his
ownership in fee of said 7,697 acres, describing it by metes and bounds, and
charging unlawful entry and withholding from him of the possession thereof
by said defendants.   Meanwhile Lewis had on February 2, 1874, sold and
conveyed the Skiles land to George W. Norris and Henry Clarke by deed which
provided substantially that they were to pay therefor $5 per acre for all that
had not been conveyed away, was not reserved expressly by the deed, and for
which good title could be given.   On the 13th day of October, 1875, in the
ejectment suit of Huntington v. Taylor, an order was entered, dismissing the
action as to Mecca C. Trimble, Aaron S. Trimble, Isaac White, and Andrew
White, confirming the office judgment had at rules against John Lewis Taylor,
impaneling a jury, setting forth its verdict for the plaintiff for the 7,697
acres claimed, described and bounded as set forth in the declaration, awarding
judgment against Taylor therefor and a writ of possession to the plaintiff.
On May 3, 1876, at a term following the one at which this judgment was ren-
dered, George W. Norris and Henry Clarke appeared and moved the court
to set aside the verdict and judgment of the preceding term, which motion was
resisted by Huntington, and the court took time to consider thereof.   This
consideration continued for a period of 20 years, when the court on May 29,
1896, having maturely considered all questions involved in the motion to set
aside the verdict and judgment and Huntington's motion to vacate the rule
and award him a writ of possession for the lands claimed by him, adjudged
that said motion for a rule came too late, that the rule was improvidently
awarded, should be dismissed without prejudice to any rights Norris and
Clarke might have, if any, in any other proceeding, and that a writ of pos-
session should be awarded Huntington for the land as described in the orig-
inal verdict and judgment.

Meanwhile, Lewis and his vendees, Norris and Clarke, had disagreed as to
the amount of purchase money due Lewis from them.   Suit and countersuit
had been brought.   Norris and Clarke set out, among other things, that Hunt-

ington had recovered and deprived them of 400 acres of the land which they ought not to be compelled to pay for. The court so held, but required them to convey back this parcel to Lewis, and such proceedings were had finally in these suits that the heirs of Lewis, who died pendente lite, became purchasers of and reinvested with the lands. One of these heirs was Mary D. Dickenson. Another conveyed to her, the other heirs and to her husband, John Q. Dickenson, his interest, and by an instrument dated July 22, 1893, the parties in interest made partition, whereby about 6,651 acres were assigned to said John Q. and Mary D. Dickenson, including the 400 acres in controversy. Here it is necessary to carefully note how the controversy about this 400 acres arises. As heretofore stated, the two original surveys—Skiles and Steele—adjoin. The Steele calls for the Skiles lines. In the Skiles grant three lines constitute the dividing ones between the two. The descriptive words of these lines are: "Beginning at two beeches and a maple, corner to William Morris, at the head of Kelley's creek, and running west 930 poles to a dogwood and white oak, corner to William Morris and Andrew Donnally;" then going around the tract until the last two calls, which are from a beech, sugar, and maple "S. 100 poles to a pine and beech on a fork of Bell's creek; thence S. 40° W. 1,500 poles to the beginning"—or, putting these three division lines together, they would be: From the dogwood and white oak, corner to William Morris and Andrew Donnally, E. 930 poles to two beeches and maple, corner to William Morris at the head of Kelley's creek (beginning corner to Skiles); thence N. 40° E. 1,500 poles to a pine and beech; thence N. 100 poles to a beech, sugar, and maple. In the Steele patent the calls are exactly these, except that the call, "N. 100 poles to the beech, sugar, and maple beginning corner," is left out, and the preceding call, "N. 40 E. 1,500 poles," calls to go to the beginning, which it cannot do. When the surveyor ran the lines of the several parcels, allotted to the parties in interest in the suit of Taliafero et al. v. Patrick et al., in which the Steele 19,500 acres was partitioned, instead of supplying the line, "N. 100 poles to beech, sugar and maple," he changed the preceding call N. "40° E. 1,500 poles" to "thence leaving the fork with original Steele line N. 76° E. 1,310 poles, to beginning corner of the 19,500 acres" at the beech, sugar, and maple which closed the survey. This was reported by the commissioners to the court on November 13, 1856, and carried into the partition decree. If the line be run according to this change, an overlap upon the Skiles is created, consisting of a triangle that would be bounded as follows: Beginning at the beech, sugar, and maple, and running thence S. 100 poles to pine and beech, thence S. 40° W. 1,500 poles to two beeches and maple, beginning corner to Skiles survey, thence N. 76° E. 1,310 poles to the beginning. This triangle constitutes the subject-matter in controversy, and is said to contain 400 acres of very valuable land, in the heart of the coal field, from which timber by agreement has been sold, and a large sum realized therefrom has been deposited in bank to await the judicial determination of the parties' rights. Huntington's declaration in ejectment against Taylor demanded his 7,697 acres by metes and bounds exactly in accord with those set forth in the partition, including the changed call of "thence leaving the fork, with the original Steele line, N. 76° E. 1,310 poles to the beginning corner of said 19,500 acres." And the verdict and judgment rendered him also follow exactly these descriptive metes and bounds. When, on May 29, 1896, after 20 years' deliberation, Judge Jackson determined that Norris' and Clarke's motion to set aside this verdict and judgment came too late, and that the rule against Huntington, to show cause why the same should not be set aside, had been improvidently awarded and should be discharged, Huntington it seems immediately sued out the writ of possession awarded him, and placed it in the hands of the marshal for execution. At this time the defendant John Lewis Taylor was living, but not on this land, having moved therefrom in the spring of 1877, as shown by his affidavit. He sold his "improvement" to one M. H. White, who took a lease direct from John D. Lewis, then living.

On January 4, 1897, an order was entered in this cause setting forth that the marshal to whom the writ of possession was directed had that day appeared and reported to the court that he had been served with a notice from John Q. Dickenson and Mary D. Dickenson, stating that John Lewis Taylor was dead, and that they claimed to hold the land by title other than that

under which the said John Lewis Taylor held said land, and could not be dispossessed under the writ in this cause; that said Marshal therefore asked the court for instructions as to his duties under said writ and in the execution thereof; that the plaintiff, by attorneys, appeared and moved the court to direct the said marshal to execute the writ according to its direction, and also offered to prove that the defendant, John Lewis Taylor, was not dead, but still living; that the tenant then on said land occupied the same house that said Taylor occupied, and claimed to be tenant of the same landlord that Taylor was tenant of. The court thereupon continued the hearing of the matter until the next day, and on the 9th of January 1897, another order was entered reciting the "appearance" of John Q. and Mary D. Dickenson and M. H. White tenant by their attorneys; that the plaintiff Huntington again moved the court to instruct the marshal to dispossess the tenant White under the writ of possession, which motion the said Dickensons and White resisted, and leave was thereupon given them to show the grounds of their said objections until the tenth day of the next term.

It is certain, now, that at the time of the entry of these orders John Lewis Taylor was not dead, as suggested, for his affidavit, produced by the Dickensons, bears date as of May 12th following. However, according to the affidavit of Crist, produced by the Dickensons, he did finally depart this life, as Crist remembers, some time in the year 1905. And Huntington also died, and thereupon, on December 10, 1902, an order was entered reviving the cause in the name of his devisees, H. E. and Arabella D. Huntington. At the November term, 1906, the parties introduced their evidence, consisting of records and affidavits, from which and from the record of the case itself the facts above stated have been obtained and the matters involved were orally argued. Subsequently briefs were filed by counsel and the case fully submitted on the motion to instruct the marshal as to his duties touching the execution of the writ of possession.

F. B. Enslow, for Huntington's devisees.
Wesley Mollohan and Brown, Jackson & Knight, for Dickenson and wife.

DAYTON, District Judge (sitting specially, after stating the facts as above). This matter has been argued orally and by briefs by all attorneys engaged to great length and with conspicuous ability. Very many perplexing questions have been suggested, the solution of which in my judgment would require a long and patient study of the history and evolution of the modern action of ejectment as regulated by legislative enactments from time to time. For instance, it is earnestly insisted for the Dickensons that (a) the writ cannot be executed with Taylor the sole defendant dead; (b) that the case cannot be revived, since Taylor, before judgment, abandoned the premises, and his heirs have never claimed the land or been in possession of it; (c) that a writ of possession against Taylor, whose tenancy and possession ended long before the issuance of the writ, cannot be used to evict a later tenant, who was not nor was his landlord nor those under whom the landlord claims ever parties to the suit or to the judgment upon which the writ issued; (d) that the return of service of the original declaration upon Taylor is void because verified before a notary who has not attached his seal thereto; and (e) that, under the descriptive terms of the writ following the judgment, the triangle of land in controversy is not included, the call, "thence leaving the fork with original Steele line N. 76° E. 1,310 poles to beginning corner of the 19,500 acres," only warranting the following of the "original Steele

line" of N. 40° 1,500 poles to the Skiles pine and beech corner, and then by the omitted line N. 100 poles to the beginning. On the other hand, it is earnestly contended that this action of ejectment was brought prior to the act of February 28, 1877, which for the first time allowed the landlord to be sued, although he might appear and cause himself to be made a defendant; that, therefore, plaintiff could only sue the tenant in possession; that all such changes in the title and possession pendente lite must be held to have been made with notice and subject to the judgment in such action; that the Lewis heirs are estopped by the court's decree releasing Norris and Clarke from paying for these 400 acres of land under their purchase from John D. Lewis because the same had been lost by Huntington's recovery; that Norris and Clarke, from whom the Lewis heirs derived back the title, having appeared and sought to set aside the verdict, bound themselves and their vendees by such judgment and estopped all further assaults thereon, except by appeal, for either technical or other defects in the judgment, and in effect made themselves and their vendors, as owners, parties to the proceeding. To this is answered, however, that their motion to set aside was refused without prejudice to their rights in any other proper proceeding.

No matter how fascinating the idea may be, with the aid of so able counsel, to consider and seek to determine these and other very interesting questions suggested, I am fully persuaded that I must refrain from doing so, and simply hold that under the pleadings, or, rather, lack of pleadings, in this case, there is nothing before this court to determine. I can find no authority warranting the ascertainment and adjudication of independent rights vested in persons not parties, in an action at law, ended by verdict and judgment, simply at the instance of the marshal or other officer seeking instruction from the court as to how he shall perform his ministerial duties in execution of the judgment. When the judgment was finally confirmed in this case, the rule to set aside, and annull, dismissed, and the writ of possession awarded, the case in my judgment became an ended cause, and no further action could be taken as between the parties thereto without a reconvention of them by some proper and authorized method of procedure. For the marshal, simply because a notice in pais which, in legal effect, can have and must have no restraining effect upon him, to come to the court and ask for instructions, is no such "proper and authorized method of procedure" to effect such reconvention of the parties themselves, and a fortiori to convene new and additional parties claiming independent rights. The judgment is simply the precept of the law, and, when once enunciated, becomes final in the case unless set aside and annulled by fixed methods of procedure. The duty of the marshal, in execution of this precept of the law, is purely ministerial, and it is no right of his to appeal to the court whose sole duty it is to enunciate the law's precept to instruct him how to perform such ministerial duty. He assumes the responsibility of knowing or of being willing and able to find out how to perform these duties when he assumes his office. In a writ of possession, based upon a judgment in ejectment, as in case of other executions based upon

judgments, it is his plain duty to obey the mandate of his writ. The court will not order such officer to execute a writ of possession in any particular manner. Bowie v. Brahe, 4 Duer (N. Y.) 676; Id., 2 Abb. Pr. (N. Y.) 161. The plaintiff should point out the premises to the officer, who should deliver possession according to his direction, but he, the plaintiff, on his part, must take possession at his peril. Den v. O'Hanlin, 18 N. J. Law, 127; Simpson v. Shannon, 5 Litt. (Ky.) 322; Jackson v. Rathbone, 3 Cow. (N. Y.) 291; 15 Cyc. 188. The law's precept, as enunciated in the judgment, is not to be presumed by such ministerial officer to be either wrong or defective, and he is certainly not to be deterred in its execution by any notice or protest that may be presented to him by private individuals. For courts to permit marshals or sheriffs to suspend the execution of the law's command every time a private individual might see fit to protest to him, and come back for "instructions," would simply lead to confusion worse confounded.

The rule that he is to be guided in the location of the property by the directions of the plaintiff, where doubt arises in his mind as to such location, which instructions are to be given, however, by the plaintiff at his peril, is based upon both law and sound sense. The facts in this case, purely as an illustration and without expressing any opinion thereon, may be referred to to emphasize this statement. It is admitted that defendant Taylor took possession of and cleared a small parcel of land entirely over on the Steele side of the original Skiles division line of "S. 40° W. 1,500 poles." Suppose plaintiff's purpose had been and was to recover this parcel, without doubt or controversy embraced in his boundary, but Dickenson, misconceiving his purposes, gave the marshal notice to stay off; how can location be pointed out to the officer by any other than the plaintiff whom the law holds responsible for his act? Suppose the marshal had followed the private judgment and advice of an individual not party to the proceeding and refused to execute the writ, could he recourse on such private person for the damages recoverable against him by the plaintiff for his failure to act? But it is insisted, perhaps, that to allow the officer to thus rely upon the instructions of the plaintiff may deprive the true owner of his rightful possession without opportunity to defend himself. Not so. He has immediate right to come, by proper proceeding regularly taken, and defend himself against the ouster, or, if turned out, to recover his possession. He cannot do so by simply serving notice on the marshal and requesting him to apply to the court for "instructions," and then, without being properly a party to the suit (for he cannot become such, it being ended), secure a determination of his rights that will have no binding effect upon him if he desires not to abide by it.

Thus it being clear to me that there is no authority for the marshal to ask for, and this court in this ended law cause, to give instructions as to how he shall perform his duty in the execution of this writ, it is also very clear that this court has no jurisdiction or right, even at the request or upon agreement of the parties, to pass upon the matters in controversy between them. These questions, so far as

156 F.—45

this case is concerned, are merely moot ones. As well said in Thomas v. Musical Mutual Protective Union, 121 N. Y. 45, 24 N. E. 24; 8 L. R. A. 175:

"Courts do not sit for the purpose of determining speculative and abstract questions of law, or laying down rules for the future conduct of individuals in their business and social relations; but are confined in their judicial action to real controversies wherein legal rights of parties are necessarily involved, and can be conclusively determined."

And in Taylor v. Mutual, etc., Life Association, 97 Va. 60, 33 S. E. 385–390, 45 L. R. A. 621:

"Whenever a court determines that it has no jurisdiction of a case, it should express no opinion upon the merits of the controversy. The only course which a court can rightfully pursue in such a case is to decline to speak at all where it cannot speak by the law."

It therefore follows that this court will refuse to give any instructions to the marshal, and, believing itself to be without jurisdiction over the parties in this proceeding as it stands, will decline to determine any questions presented upon this motion, such declination being entirely without prejudice to all parties to assert and defend any and all rights they have by any proper proceeding they may institute or in any that may be instituted against them, and this case will be stricken from the docket and ended without further costs to any one.